## *In re* HAINES.

1. CERTIORARI—SCOPE OF REVIEW OF EVIDENCE.
    On review by ancillary certiorari of the proceedings in the probate court for the detention of one as insane the Supreme Court does not pass upon the weight of testimony, the limit of review being to determine whether any competent testimony was produced from which it could reasonably be found that petitioner for habeas corpus was an insane person.

2. INSANE PERSONS—EVIDENCE.
    Testimony taken in proceedings to commit person as insane *held*, not to have proved insanity, hence, commitment as an insane person was illegal and entitled such person to discharge on next friend's petition for habeas corpus.

---

* See 2 Comp. Laws 1929, § 8417, as amended by Act No. 245, Pub. Acts 1943 (Comp. Laws Supp. 1945, § 8417, Stat. Ann. 1945 Cum. Supp. § 17.151).—REPORTER.

3. SAME—CERTIFICATES OF PHYSICIANS.

In the absence of other competent proof, an adjudication of insanity may not be based on the certificates of physicians appointed by the court to examine the alleged insane person.

4. HABEAS CORPUS—INSANE PERSONS—DISCHARGE.

It is not within the province of the Supreme Court in habeas corpus proceeding with ancillary certiorari to probate court which committed petitioner to determine whether he was insane at the time of commitment or whether he is now insane, but merely to determine whether or not petitioner is entitled to a discharge.

Habeas Corpus by Eric Golting, friend and legal guardian of Harold H. Haines with ancillary certiorari to Wayne Probate Court to obtain his release from the Veterans Administration Facility, Fort Custer, Michigan. Submitted August 26, 1946. (Calendar No. 43,405.) Release ordered October 7, 1946.

*Royden E. Jones,* for petitioner.

*John R. Dethmers,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *Gerald K. O'Brien,* Prosecuting Attorney and *Andrew DeMaggio,* Assistant Prosecuting Attorney, for people.

NORTH, J. This is a habeas corpus proceeding on petition of Harold H. Haines who is detained as an insane person at the Veterans Administration Facility, Fort Custer, Michigan. He was committed by order of the Wayne county probate court in July 1945. Upon filing the petition in this Court wherein it is alleged that petitioner's "restraint and incarceration is illegal" and his "commitment was a nullity and not in compliance with the law," a writ of habeas corpus was issued, and also an ancillary writ of certiorari to the probate court by which petitioner was adjudged insane and committed. Return has been made to each of the issued writs.

Among other questions presented is petitioner's contention that at the hearing in the probate court no competent testimony was produced tending to prove petitioner's alleged insanity, and therefore his commitment by the probate court was absolutely void and his present detention is illegal.

On review by certiorari of the proceedings in the probate court we do not pass upon the weight of testimony. Instead the limit of such review is to determine whether any competent testimony was produced from which it could reasonably be found that petitioner was an insane person. Return to the writ of certiorari includes a transcript of all the testimony taken. The only witness who testified in the probate court was Anna Haines, wife of the petitioner. She was interrogated by the probate judge. We quote all of her testimony material to determination of petitioner's contention that there was no proof of his insanity.

"*Q.* (Probate Judge)  *  *  *  Relating now to the time this application was made on the 28th of June, the time that he (petitioner) was taken to the hospital, can you tell us about it? He came home from work you started to tell us.

"*A.* And had supper.  *  *  *  He had supper and took the Bible and went to the neighbors.  *  *  *  Took the Bible and went into the neighbors' to read the Bible to the man across the street and things like that. But he knew definitely he wasn't right.  *  *  *  He seemed to be all right, at the table, I mean. He ate supper.  *  *  *  He just stepped across the road. The man was out in the yard.

"*Q.* How long did he remain at the neighbors'? How long did he stay at the neighbors'?            •·

"*A.* Oh, 10 or 15 minutes.

"*Q.* Then when he came back what did he say?

"*A.* Oh, he sat down on the front porch and read to the boy from the Bible.  *  *  *  Well, he didn't

say much in the house. He was—he was loud. He
looked for three potatoes in the yard and couldn't
find them, and he was rather loud finding them and
took the spade and put them down—down about
that far (indicating); and I doubt if they will ever
come up. (Laughing) And then he come around
the front of the house again and, well, I guess when
the police came he told them about the lightning in
the canal zone and places like that. It had been
lightning for part of the evening. And he told
them about the flashes coming up right around
people but it didn't hurt them. But he was rather
afraid of lightning.

"*Q.* Well, did you conclude, from those episodes,
that he was mentally deranged? Did you know that
there was something the matter, he was out of his
head?

"*A.* No, I didn't think he was mentally deranged,
but I did think that—

"*Q.* You mean from those episodes you didn't
draw any conclusion at all? Do you think it was
perfectly normal for a man to take the Bible to his
neighbor?

"*A.* Well, I guess the neighbor has come over
to us, too.     *     *     *

"*The Court:* I wish you would be a little more
frank.     *     *     *     Tell me what he said and did. If
he acted like a normal man, let's hear about it. If
he acted like an insane person, let's hear about that.

"*A.* I never saw him insane.

"*The Court:* I don't care anything about what
you thought. I have a good deal of respect for you,
but your opinion on that is not of any value. All
I want from you is what he said and did that is
out of the normal.     *     *     *     That the ordinary man
would not say and do.

"*A.* Well, I think I have told you.     *     *     *     I
think I have told you what I can.     *     *     *

"*Q.* Why did you call the police if your husband
was behaving normally and—perfectly serene? Why

did you call the police? Well, you knew that he was out of his head, didn't you?

"*A.*   Well, no.

"*Q.*   You spoke about his digging the potatoes. He was digging in the yard for the potatoes.

"*A.*   I don't know whether it was temper or whether he was out of his head, your Honor. I would rather have an extension of the temporary commitment and have the Veterans' Administration send their—(witness interrupted).

"*The Court:* There is no use in extending it at all because with his  *  *  *  His condition now, in accordance with what the doctors say, is a condition that requires a permanent course of treatment, whatever is the foundation of it. He has a delusion of persecution, thinks that everybody is against him. That is a very dangerous form of insanity."

We are unable to reach any other conclusion than that the testimony taken did not in any reasonable sense tend to prove insanity, and in the absence of any proof of insanity the commitment of petitioner was and is illegal.

In reaching the above conclusion we are mindful that at the hearing the probate judge had before him the certificates of the two duly appointed physicians, each of whom certified that Harold H. Haines was an insane person; and doubtless the probate judge in so determining relied mainly, if not wholly, on such certificates. But it is settled law that in the absence of other competent proof an adjudication of insanity may not be based on the certificates of physicians appointed by the court to examine the alleged insane person. *In re Clifford,* 303 Mich. 84; *In re Buck,* 308 Mich. 634.

It is not within the province of this court in this proceeding to determine whether petitioner was insane at the time of his commitment or whether he

is now insane. But on the record before us we must and do hold that the proceedings in the probate court were fatally defective and that Harold H. Haines is entitled to be discharged. It is so ordered.

BUTZEL, C. J., and CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred. STARR, J., took no part in the decision of this case.